Call the case. First case. Okay, would you step up and identify yourselves? Your Honors, Christopher Evers from the Office of the State Appellate Defender for Mr. Calloway, the appellant. Good morning, Assistant State's Attorney Christine Cook on behalf of the people.  First, at 15 feet, I have a different feeling than at least one of our members as to whether that's adverse or not. In the sense that, to me, that's not that far away. Oh, so that's talking about 15 feet from where? From where the gun was and whether he could actually possibly reach it. Or is it 15 foot from the door? No, that isn't 15 feet from you. 7 feet from the front of your table. No, I'm saying from there to the wall. There you see, there's another pencil. Oh, I'm sorry. There's another pencil there and then there's something over there. Okay, well, I'm sure we'll discuss that today, the ramifications of 15 feet. All right, I figured I'd try and confuse you or at least give you a chance to have some fun. You may proceed. Thank you, Your Honor. You guys know at length that we're pretty liberal unless it just keeps going. And you know that the microphone is to record, not to speak to. So I will project, of course, Your Honors. May it please the Court. Thank you, Your Honors. My name is Chris Evers, once again, from the Appellate Defender's Office. I would like to reserve a few minutes to rebuttal for my time, and I will keep conscious of the time as you go along here. Speaking for Mr. Callaway today, I'd like to focus my argument on the first issue raised in our brief, that the State's evidence was insufficient to show that Mr. Callaway was otherwise armed to sustain a conviction for armed violence. Of course, I will be happy to discuss the multiple instances of ineffective assistance of trial counsel that we discussed in our brief, answer any questions, and dive into those issues if there's specific inquiries that the Court would like. But what this case comes down to is that the State's evidence was this. At the moment that they breached the door and rushed into the apartment, Mr. Callaway was running away from the police, running away from the couch, and was at such a distance from the gun on that couch. Do you think that's at such a distance? For immediate access and timely control, yes, Your Honor, because it's not about whether someone could get to the gun in a couple of seconds. The Illinois Supreme Court has been clear in Condon, Haar, and Smith that it's the instantaneous decision, and the courts in the cases that have upheld armed violence, Haar itself, Curry, stated by the State, all the testimony has been within arm's reach, two to three feet. Or one case of Scott, there was a love seat one foot away, there was a shotgun beneath it. That's the instantaneous decision, frankly, to make the deadly choice to engage in some kind of violent confrontation. And let's keep in mind that Mr. Callaway was running away from the gun. He would have literally had to stop, turn around, and run back to that from a distance of 15 feet to get there. That is not timely control or immediate access under any decision cited by either party in today's case. And so that's what we're asking you to do is, frankly, it's a very straightforward application of interpretation of the phrase of otherwise armed, which is the Illinois Supreme Court has defined immediate access and timely control. And that's a narrow construction. And that's something to keep in mind that the Illinois legislator put into their distinctive legislative findings, and all the Supreme Court cases discussing it, that timely control and immediate access is narrow. It is not constructive possession. That was rejected in Condon. That was discussed in Haar and Smith. And they've all agreed that constructive possession, a much broader concept for a crime such as overall drug possession, unlawful use of a weapon, even armed habitual criminal, which Mr. Callaway was also convicted of, has that broad basis because we don't want people to possess or otherwise control in general. Otherwise armed for armed violence gets to the idea it's the potential for that instantaneous decision, which Condon said is a person is, quote, forced to make a spontaneous and often instantaneous decision to kill without time to reflect on the use of such deadly force. What about the police officer's decision when he walks in and sees the gun? So the officer saw the gun. That's true. But specifically the officer, the breaching officer, who broke open the door and the first person to peer inside there saw the gun in the couch, never saw Mr. Callaway. The other officers who entered immediately after the door was breached saw Mr. Callaway, one testified from the trial court's description of 15 feet away. Another officer on direct testified that he saw Mr. Callaway running away from 7 to 10 feet. There is complete agreement among all the eyewitness officers that Mr. Callaway was traveling away from the gun and was not within arm's reach of it. And that is the important thing to be considering here. There was no possibility of an instantaneous decision when he abandoned the gun. And this Court, frankly, needs to look no further than People v. Smith from the Illinois Supreme Court to see that that case hopefully will drive your decision today. What about Curry? Well, Curry, Your Honor, is factually distinct and also kind of supports their position in the sense that there the police were coming up to the back of the apartment. Curry saw them, ran away, and there's evidence that he was kind of reaching at his waistband. He goes into his apartment. The police follow him to his apartment and chase him all the way through that. Only once they get him out of the apartment and in the stairwell does he throw down the gun, throw down some drugs. There was no attempt to abandon the weapon at all until the police have already kind of caught up to him. Mr. Callaway abandoned that couch before the police even entered the door because the breaching officer, the first eyes in on the very narrow aspect of the door, never saw him. He was gone and away from the gun before that door was all the way open and the other officers rushed in. That's what happened in Smith. The officers saw the defendant in Smith holding a handgun, dropped it out the door, and the court was very clear that when the police entered the apartment, there was no possibility for a deadly confrontation that upheld the deterrence aspect of armed violence, which is what happened in today's case as well for Mr. Callaway. There was not a possibility of any immediate potential for an armed confrontation, and upholding the deterrence effect of the armed violence conviction is what we're asking the court today. That's consistent with Smith. It is consistent with Condon, which also held that there was no possibility for this kind of deadly confrontation. Even though there were 13 guns in the house, none were in the kitchen. And that is consistent, frankly, with all the other cases that have been cited today, even by the state. Curry, the Anderson case from 2018. Every single one of those, there was a weapon on the person, or an Anderson from 2018 when the man fell down, two to three feet in front of him, otherwise armed, immediate reach. None of those facts exist in today's case. And so for that reason, we really think that this is a straightforward application of that. And one final thing to keep in mind, and there has been some discussion in the most recent cases from the district court dealing with armed violence, is that the deterrence effect is not a solo endeavor. In Condon, in Haar, in Smith, the courts talk about the idea of a confrontation between the defendant and law enforcement, other criminals, or the victim. That means there has to be someone else there present. One of the things that the state talked about in their closing arguments was that before the police broke the door down, Mr. Calaway might have been sitting next to the gun. That is completely irrelevant. A person sitting in an apartment by themselves has no immediate potential for an armed confrontation. They are by themselves. That is not the purpose of armed violence, and that is consistent. Well, there's the purpose of the statute in the letter of the statute. Absolutely, Your Honor. If I'm walking down the street with drugs and I'm armed, have I committed armed violence before I've met any person I'm going to do a drug deal with? If you're on the way to a drug transaction, that would be armed violence, and that's exactly what they found on Haar. But there's no confrontation. Well, if the police are watching you and they see that you're on the way to a drug transaction, yes. There has to be enough evidence to establish you're on the way to the drug transaction. Yes, Your Honor. But that would be armed violence here. But again, out in the public there, that's what the legislator talked about in their legislative findings. Confrontation bystanders could be hurt. Someone by themselves in the apartment. I'm saying in my scenario if the police never confronted him. They just surveilled him. They just took video of him and arrested him the next day or something. But they had him on video with a gun and drugs. But no contact. He's all alone on the street. Has he committed armed violence? Again, and I'm not trying to avoid your question, Your Honor. It depends what happened. Just for that flash moment, that second in time, no, that's not enough. It would be our position for that. But the statute doesn't say that, right? I mean, we know why we have the armed violence statute. But the letter of it says he commits a predicate felony while otherwise armed. Or in my example, he'd be literally armed. But either way, why wouldn't that be armed violence? Well, no, and what I'm getting to, Your Honor, if he's out walking with the drugs, presumably he's going somewhere. He's going somewhere, yeah. Exactly. And that's what's different from all the cases we've talked about here is that this is just someone inside their house. There's not a drug transaction going on. And independent of your hypothetical there, Your Honor, that's not what we have here. This is someone inside their house doing that, and Smith itself rejected that idea. But is this – you know it's not the moment of arrest that we're considering. Oh, absolutely, yes. Is it the moment of interaction with another person? The courts have specifically and consistently held interaction of some form that you encounter with police. Condon talked about the fear of how a victim may respond when – to the felony there. Right. But yes, there is some interaction going on there because it's that moment of interaction where the person can make the bad decision, the instantaneous decision going on, especially – and this is circumstantial evidence. If you're outside the apartment walking with drugs going somewhere, that could be on the way to the drug transaction. And Haar kind of pieced out these two separate concepts, the idea of immediate access and control, which was when he was standing next to the car and he could reach in there. But they went on, because that was enough to establish armed violence. But they went on to talk about further evidence in Haar, which was different from Condon. The man there was in the middle of a drug transaction, literally driving up to the house to drop off a bunch of drugs. And so even your hypothetical, Your Honor, of walking in the street, having the armed violence, that's a closer case. A lot of it would depend on the specific circumstances and the facts produced by the State as evidence. But here, the evidence is here is Mr. Calloway abandoned the gun, just like in Smith, that found even though the police saw him holding a weapon inside his house when he was constructively possessing drugs, was not enough. And the court in Condon expressly rejected that argument by the State, that because there was an ongoing possession of all the drugs in the house, and he presumably moved around the house because there was drugs – there was guns in bedrooms and other places, they rejected that was enough to prove armed violence. And that's the situation we have with Mr. Calloway. The fact that there might have been cannabis in the house, and he constructively possessed it, is independent from the fact that when the police encountered him, they broke open the door, he had abandoned the couch, abandoned the gun, and was moving away at them. No immediate access or timely control. So the moment that we focus on is not just any moment that he might have the gun and could hypothetically maybe someday or some moment come into a possibility for a violent confrontation. It's when there is that possibility for a violent confrontation, when a police officer approaches them, when anyone approaches them. It doesn't have to be a police officer. But there has to be that moment when there can be violent confrontation. That is consistent with all the decisions that we've cited today and with the legislative findings, that just by yourself is not enough because that's been rejected by the Illinois Supreme Court. The deterrence effect is to encourage people not to have guns at all, not have weapons, and that way you can be sure. But if there is a weapon around, to make some kind of obvious abandonment of it to decrease the possibility of a deadly confrontation. Well, let's change the hypothetical just a tiny bit. He's walking down the street being surveilled, and he sees a police car turn a corner, and he drops the gun and the drugs. Do we have armed violence there? Well, if he immediately abandons the weapon and runs away or something, then yes. Now, if he drops the gun and stands there, then you've got cases that say arms reach is enough. But, yes, abandonment plays a large role from Condon and the decision in Smith about how you decided there's armed violence. It's a very fact-specific inquiry you're on. There was no abandonment in Condon. Condon, he was just in the kitchen, not near a gun. You're absolutely right. I didn't mean to imply that. You're talking about Curry? Well, Curry, well, he didn't abandon the gun because he was running with it. Well, Smith in any event. Smith is certainly in abandonment. Well, Smith certainly talks about that. I know, at least in one of the cases, that in Scott, a 2011 case, of course, what he said, he made no attempt to abandon the gun. So, Justice Howson, your hypothetical, an attempt to abandon the gun instantaneously, showing that I do not want a deadly confrontation, I decided pursuant to armed violence to eliminate the potential thing, plays a role in whether there should be a conviction for that, too. But a lot of it really is the entire totality of the circumstance. But we know that totality in today's case. There was no possibility or immediate possibility of instantaneous bad decision. Mr. Calaway was already running when that door opened up. And that is insufficient to support the decision of the jury that there was armed violence there, too. So the Supreme Court really is not following the letter of this statute exactly. It's formed a policy decision in Smith and the cases. Well, I would disagree, Your Honor. I think they are following the letter for that, recognizing that the legislature, which doesn't happen with every criminal offense, has pretty detailed legislative findings of what we want this criminal offense to do. The idea of dispossessing a gun is covered by unlawful use of a weapon by a felon or otherwise on habitual criminal. So the idea of armed violence is to narrow it down to the idea of in that instantaneous decision. Now, the best way to never have to worry about it is never have a gun in the first place, but that's not the reality we have here or in a lot of other situations. But I would not say the only legislator is ignoring the letter of the law. They're recognizing that it takes two to tango. There can't be a deadly confrontation if someone is confronting you or resisting you or not doing what you want if you are by yourself. There's no crime there once someone gets involved in that, breaking the door down. They're doing a hand-to-hand transaction. Yes, they're criminalizing that, even if no violence takes place, because you have created that potential by not abandoning it or bringing it around. But none of that exists in today's case for Mr. Calaway, and that's really why we're asking you to reverse this conviction outright. Very briefly, also supports that. I don't think we need to discuss the other topic. I can get into it. I don't think any of us are concerned about that. Thank you very much, Your Honors. I'll take a few minutes for rebuttal. Thank you. May it please the Court, Counsel. The problem with the argument today is not only ignoring the facts of the case, but ignoring the standard of review. Contrary to the opening in the reply brief, this Court is not to be reviewing these facts de novo. They are to be responded in the light most favorable to the State. Here is what happened below. The police officers had a forced entry into the second floor of the apartment. It took them several seconds to breach the door. When the door was opened, the first officer, Bukowski, had his shield, and he testified that the defendant was 15 feet from him, not the gun, him, when they entered the door. The defendant, at this time, is seen fleeing. According to the police officers Walsh and Doherty, he's fleeing from the living room into the kitchen, which puts him, according to exhibit number eight, in this very small space of the living room. The defendant is not steady. He is in flight. As you can tell from the pencils on the floor, that's a pretty short distance when somebody's in full flight. There is no evidence that the defendant was 15 feet from the gun. He was 15 feet from the officer who initially breached the door. That's on record VV 36 and 37. There is absolutely no evidence about how much distance there was from the defendant to the gun in the transcript. But what is clear is when officers – Well, counsel, is that something for the State to be proud of? I'm getting to that. When Officer Bukowski first breached the door and the first officer saw the gun to the immediate right of the door, he screamed, gun, gun. Because the defendant is in this same room moving, and if the couch is on the right, exhibit number eight – I'm sorry? I believe that the jury clearly found that to be true. Because according to exhibit number eight, in order to get into the – What was the testimony you're trying to – The testimony is that the defendant is fleeing from the living room into the kitchen. Is that away from the gun or toward the gun? It's probably toward the gun. They don't explicitly say that. But again, this is why de novo review is inappropriate. Well, we have a front door and then a living room. Right. And behind that, the dining room. Right. And he's running from the living room into the dining room. He's not running towards the couch where the gun is. He's running towards the dining room. He could have been running this way toward the couch to get into the dining room. There's no evidence he's running from the gun. He's running from the police, clearly. But there's no evidence he's running from the gun. Fair enough. If he's running in the direction that you're suggesting, then he would not have been on the couch to begin with. Well, we don't know where he was. Well, but then that wouldn't make any – the couch was to the right. Yes. And the door. Right. If he's running this way, then that means he wasn't on the couch when the police knocked on the door. Well, we don't know where he was or how he was moving or if he was moving when the police are – during that five to seven seconds when they're attempting to breach the door. Okay. Well, my understanding, and I could be wrong, that's why we have oral argument, is that – well, certainly the state's theory at trial was he was on the couch and then he started running. And you're saying, well, he wasn't necessarily going this way, away from the couch. He could have been going this way sort of – not maybe directly to the couch, but towards the couch. In the direction-ish. But if he's – but the two things can't both be true. He can't have been on the couch and be coming from this direction. Yeah. I don't – the transcript is very unclear as to the distance from the defendant and the gun at the time the officer was entered. The transcript is not very clear. But that's not a great thing for the state. No, I agree. I would love to have a very clear transcript until you turn to this page and here it is. Yeah. Well, what are we supposed to do with that, though? So there's no definitive evidence in the record how – what direction he was running or how close he was to the gun. Right. But we should affirm. Yes, because we have a standard of review that requires that this court look at the evidence in a light most favorable to the state. And let's also keep in mind what the defense at this trial was, because we're in a different land here on appeal. The defense was that the defendant was never on the second floor apartment. He claimed he was on the first floor visiting his aunt's sick boyfriend and that the police executed the search warrant, went down to the first floor and needed to blame somebody. Right, but that was the defendant's story and the jury didn't vote. Right. Okay, why are we talking about the defendant's story? Because what we're doing is shifting the entire focus here. I realize this is a reasonable doubt argument. You can't waive that. It's never forfeited. I understand that. But even in the light most favorable to the people and in this record, this is why the trial transcript, although it's, granted, not terrific, there was no doubt in the jury's mind because they're properly instructed as to what armed violence is, what's required for armed violence, and they found him guilty. That's a finding of fact. I don't know when these officers testified, how they were motioning or anything like that, and neither does this court, which is why do you know a review is so inappropriate. But most importantly, at the motion for a new trial, defense counsel asked about this and the judge actually said, I believe he had actual possession of the gun when the officers breached the door. The judge who heard all of this testimony. Did he hear any testimony that said that? I'm sorry? Did he hear any testimony that said he was in possession when they breached the door? No. Actual possession is a misstatement because nobody saw him in physical, actual possession of the gun. And in order for you to prove this case, and with a gun lying on the sofa, wouldn't you have to at least prove that he was attempting to come to the gun? No. No. You don't need that at all. The case law is replete with facts that they don't need to make affirmative actions. They just have to have accessibility or timely control over the weapon. There's no affirmative actions that need to be made in order to sustain an armed violence conviction, and that's replete with the case law cited in our brief. And granted, I was just. Would you agree that the record shows that his back was turned to the couch and he was running away? I don't know that either. You don't think the record shows that? I don't get that from the transcript. That's interesting. Okay. Well, what if you did? What if that's what the record showed? That his back was toward the gun? No. Yeah, his back. He was running away from it. He was running. If there was affirmative evidence. He was running in the living room towards the kitchen. Yeah, if he. Which by virtue of the layout meant he was running away from the front door. Right. Which stands to reason if he was fleeing from the police and he was running from the couch, which was right next to the front door. He's going. If they're on the south end, and I don't know the north-south, but if they're  No, I understand your question. So how does that show immediate access to the gun? If there's affirmative evidence that the defendant was removing himself from the gun, I'd have a problem. But I don't have that record in front of me. Where did they apprehend him? On the first floor. Because he ran out the back? Yeah. So did he. Well, eventually he winds up distancing himself from the gun, but that's not the proper inquiry, Your Honor. The proper inquiry is, was he, did he have immediate access to or timely control over the gun at the time the officers breached the door? And this record and the jury's verdict and the trial court's refusal to overturn that finding of fact gives this court sufficient reason to affirm. I wish there was a better record on this, but there's not. Not in the transcript. But again, we don't know how the officers were motioning, whether they were using pictures to display this, but this wasn't really a legal or factual issue contested by defense counsel. Because, again, his defense was, man, I was on the first floor and this whole case got pinned on me. And now. What do you think is the operative moment in time that we should be looking at? When the officers breached the door. So you agree that the first time the police entered the door, that it's under Smith, that that's what we have to look at? Yes. Okay. Yeah. And at that moment, you think the record could reasonably suggest, taking the evidence in the light most favorable to the state, that the defendant had timely access. What is the phrase? Timely access. Timely access or immediate access or timely control. Immediate access or timely control. Mm-hmm. Over that gun. Yes. How close would he have to be to have timely access or immediate control? Immediate access or timely control. Do you agree with what counsel said? Two or three feet? I'm never going to put a number on that. Because, again, it's all factually driven. Somebody's running. Even if it was 15 feet, that could be very timely control or immediate access if somebody's in full flight. I mean, again, it all depends. Someone's in full flight towards it? Yeah. Okay. Right. The defendant was not fleeing towards the gun. You don't know that, Your Honor. That's the problem with the circuit. Are you kidding me? No, I'm not kidding you. And where in the record does it say he was fleeing from the gun? He's fleeing from the officers. He was in the back door of the apartment, away from the gun, and toward the gun. It's away from the gun. Well, it's in a different collection from the gun. But then, again, Your Honor, that's not the critical question. The critical question is, where is he at the time of the confrontation? Because that ignores the whole purpose of the armed violence statute. But don't you want defendants to run out the back door? We always want the defendants to run out the back door. I love it when the defendants drop guns. That's a great thing. But that's not a relevant inquiry in determining whether or not you can affirm this armed violence conviction on these facts. Counsel, you're correct that it's the moment of the entry. Right. I mean, that's what Smith says. So I don't think Justice House was suggesting that otherwise. I think his point was that speaks to the direction he was running. I mean, he, you know, the police officer came through the front door. The couch is right there. Right. And you're telling us that the record might suggest that the defendant was running towards the police officer. There is nothing in the record that I'm aware of where any police officer remotely suggested that they were, in any kind of a way, threatening or otherwise, the defendant was coming towards them. I mean, the only evidence we have is they start yelling, he's running, he's running. Right. If someone's coming towards you, you don't say he's running. You say that when he's running away from you. You're saying, let's go get him, everybody. We've got to chase. Someone secure the gun. Let's go catch this guy. No, they yelled gun when they first got to him. Sure, sure, because that's the other thing that was going on. He was running and there was a gun. Yeah, yeah. But at the moment, they breached the door. Again, the only evidence we have in the transcript itself is that Officer Bukowski says the defendant is 15 feet from me, whether that's to the right or to the left. Okay. I don't know. I don't know. I mean, but again, the evidence taken in the light most favorable to state does not require and actually precludes this court from finding the opposite. These are findings of fact made by the jury in this case after being properly instructed. I do wish this record was clearer in the transcript. Did the instruction talk about timely control and immediate access? I believe it did. I didn't look at them because it's not at issue. I'm assuming the jury was properly instructed. I wish I could give you a transcript that says precisely what I wanted to say. Here's what we do know, and that can't be objected to. Walsh and Doherty, the defendant is, and I quote, fleeing from the living room into the kitchen area. He's in the living room at the point of breach. That living room, if you look at Exhibit 8, is a really tight space. It may not even be 15 feet wide. That's all we really know, and that the gun is sitting on the couch. But let's also look at a couple of other facts in this case that may help you out a little bit enough to affirm. This defendant, I think it's 2 o'clock in the afternoon, is in his boxer shorts in that living room area. Those officers are repeatedly ramming the door. They estimate it takes about 5 to 7 seconds to breach the door. And yet, even with that, this defendant is still in that living room by the time they breached the door. Is there a bedroom next to the living room? Yeah. There's a bedroom off the living room and one off the kitchen. Could he have been in the bedroom? He could have been in the bedroom. If he's in the bedroom, he's running toward the gun. Well, I mean, I could have this wrong, but I think it would be more, I mean, if the bedroom is here and the couch in front door, I'm sorry, the living room is here and the kitchen is here, he's going like this to leave, right? I mean, he may come somewhere. I mean, in some sense, he's entering the living room, which has the couch in it, but he's not going in that direction. You don't know that. Why would you run towards the cop? Because that's the only access to get out. No, no, the access is the other direction. But you have to go through the living room to get into the dining room, to get into the kitchen, to get into the back door. That's the only way out is to go through the entire apartment, because I think it's a two-flat. I don't know if it's a two-flat or an apartment. I think it's a two-flat. If he's in that bedroom, in the front bedroom, he has to, according to the way I'm looking at exhibit number eight, if he was in the bedroom when the officers were beginning to breach the door, he's running toward the dining room and he's running toward the couch. Well, you know, I don't think we need to continue to argue about these facts. When I see the transcript, he's running away. The cop breaks in because he's running away. He's in the living room. He's in the living room. At the time the police breached the door. That the testimony, exhibit number eight, are not the best evidence for this court, granted. I will give you that. Wish I could give you more. But the finding of fact was that the jury found him guilty of armed violence. And when specifically asked about this, the trial court expressly rejected the notion that the defendant did not have immediate access or timely control. Right, because he thought he had the gun. And you admit that's wrong. Yeah. The statement of actual possession is just legally, or factually, it's incorrect. Maybe he misspoke. The point being, he's like, no way. Not based on what I heard today. And that's the difference between being in a trial room and being on the appellate bench. There's a lot of things that this court is never going to see or be able to infer or credibility determinations that you cannot make. Granted, this record is not the best. But it is absolutely sufficient to affirm the armed violence conviction based on this record. Based on all of the reasons we've stated today, and for that covered in our brief, the people respectfully request that this court affirm the armed violence conviction of this defendant. Thank you. Your Honor, this is a very good statement about, obviously, factual inquiry going on. There is no credibility determination. The officers testified what's going on. The opposing counsel talked about people's exhibit eight a lot. Please look at defense exhibit number one, which is a photograph standing in the dining room, looking past the dining room table into the living room itself. It gives you a better perspective of what's going on. And the reason why we know that Mr. Calloway could not have been running towards the gun is that the breach officer, the man who opened, broke open the door. He testified that there was a knock on the door by Officer Gowdery, the acting officer. Five to seven seconds later, they broke the door down. Not that they hammered for five or seven seconds. They just broke the door down, which the opposing counsel has said. That's when we look at it, the moment that door swung open. The breach officer testified he saw the gun slide to the right. He never saw Mr. Calloway. Mr. Calloway never crossed his vision, which means he had to have been past and moving away from the gun when every single other officer came in. The second officer in was the shield officer, Officer Bukowski, who Sergeant Gade testified went left. Sergeant Bukowski is the person who immediately saw Mr. Calloway running and said he's running. Yes, the breach officer yelled gun, but there was yelling going on. The second officer in, Officer Gowdery, did not see Mr. Calloway enough. Initially. He had to hear he's running before he saw him going around. If Officer Bukowski, the shield officer first in, went left, he saw Mr. Calloway in profile. Never saw his back, but did see him in profile, accelerating and moving into the dining room. He never was near that gun because the gun was to the right. Sergeant Bukowski went left, and he was already moving away from Sergeant Bukowski in profile. Therefore, he had abandoned the gun. Fifteen feet, one of the officers testified Mr. Calloway was seven to ten feet away. At the end of the day, that's their estimation. A part of the court said you came to a mathematical calculation from that, but not a single officer said he was an arm's length of the gun. And that has been the standard for every single case that we've discussed today in our briefing and the additional cases of armed violence. And for that reason, we'd ask you to reverse the convictions of armed violence for Mr. Calloway and consider also the issues raised in our third issue as well. Thank you, Your Honor. Thank you. Thank you both. It was both very well, exceptionally well argued. It's nice to see two really outstanding attorneys appear before us because that's not always the case. We appreciate it. Thank you.